# COURT OF CHANCERY
# OF THE
# STATE OF DELAWARE

SHELDON K. RENNIE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 10400
WILMINGTON, DE 19801

Date Submitted: February 16, 2024
Date Decided: February 20, 2024

Kevin R. Shannon
Christopher N. Kelly
Hayden J. Driscoll
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801

Christopher Viceconte
GIBBONS P.C.
300 Delaware Avenue
Suite 1015
Wilmington, Delaware 19801

RE: *Andrew Dolce v. WTS International, LLC*,
    C.A. No. 2023-0789-SKR
    Defendant's Motion to Dismiss

Dear Counsel:

This letter decision resolves Defendant's Motion to Dismiss. For the reasons explained below, this action is stayed pending completion of the Asset Purchase Agreement's alternative dispute resolution process.

# I. FACTUAL BACKGROUND[1]

Sellers were engaged in the business of providing design, consulting and outsourced management services (the "Meet Hospitality Business Unit" or "Business").[2] On December 20, 2021, they sold the Business to WTS International, LLC ("WTS" or "Defendant") by entering into an Asset Purchase Agreement (the "APA").[3] As consideration, Sellers received cash and potential earn-out payments.[4] Andrew Dolce served as the Seller Representative ("Dolce" or "Plaintiff").[5]

## A. The APA

Section 1.6 of the APA provides for earn-out payments based on the Business' 2022 and 2023 EBITDA. Exhibit F to the APA defines "EBITDA" and sets out the "methodology and rules" to calculate it.[6] In relevant part, Exhibit F requires that WTS maintain standalone Profit and Loss ("P&L") statements for the Meet

---

[1] The facts are drawn from the well-pleaded allegations in the Verified Amended Complaint, and documents incorporated by reference. Verified Amended Complaint ("AC") (D.I. 9). Additional facts are drawn from documents outside the Amended Complaint in consideration of Defendant's Motion to Dismiss under Court of Chancery Rule 12(b)(1). *See Wildfire Prods., L.P. v. Team Lemieux LLC*, 2022 WL 2342335, at *3 (Del. Ch. June 29, 2022).

[2] AC ¶¶ 2, 14; Transmittal Affidavit of Hayden J. Driscoll to Defendant's Opening Brief in Support of its Motion to Dismiss Plaintiff's Verified Amended Complaint ("Aff. Driscoll") (D.I. 15), Ex. 1 Recitals ("APA").

[3] AC ¶ 2; *see* APA.

[4] AC ¶¶ 16-17. Sellers are Meet Hospitality Services LLC ("Meet Hospitality"), Meet at Chrystie, LLC ("Meet at Chrystie"), Dole Family Limited Partnership ("Dolce Family"), Sarah Schiller, Paul Dolce and Andrew Dolce. APA Recitals.

[5] APA Recitals.

[6] *Id.* §§ 1.6(a)(i) and (b)(i); *see id.*, Ex. F.

Hospitality Business Unit in accordance with generally accepted accounting principles; identifies items constituting revenue; and prescribes the methodology for calculating expenses.[7] WTS and Dolce were also to prepare mutually agreeable operating budgets for the Meet Hospitality Business Unit.[8]

Section 1.6(a) requires WTS to submit its EBITDA Calculation based on the methodology and rules set forth in Exhibit F.[9] Dolce may object to the calculation:

> by notifying [WTS] in writing of each objection and a reasonably detailed description of the basis therefor (but only on the basis that the […] EBITDA Calculation contained arithmetic errors or was not prepared in accordance with [the APA] and the methodology and rules set forth in Exhibit F).[10]

If the parties fail to resolve the disputes, "either [Dolce] or [WTS] may submit any remaining disputes, and only such remaining disputes, to the Accountants for review and resolution."[11] The resolution by the Accountants "shall be within the range of dispute between [Dolce] and [WTS] and shall be set forth in a written report."[12] The resolution shall "be final and binding upon the parties."[13]

---

[7] *See id.*, Ex. F.

[8] *Id.*

[9] *Id.* §§ 1.6(a)(i) and (b)(i).

[10] *Id.* §§ 1.6(a)(ii) and (b)(ii).

[11] *Id.* "Accountants" is defined as "FTI Consulting Inc. or, if such firm is not available for such assignment, such other firm upon which [WTS], on the one hand, and [Dolce], on the other hand, shall reasonably agree." *Id.* § 1.5(a)(ii).

[12] *Id.* §§ 1.6(a)(ii) and (b)(ii).

[13] *Id.*

Section 1.6(e)(i) also required WTS to provide Sellers with "unaudited quarterly financial statements for the Meet Hospitality Business Unit, as and when prepared in the ordinary course of business."[14]

## B. The Notice

On multiple occasions between April 2022 and October 2022, Sellers requested preliminary Profit and Loss ("P&L") statements.[15] WTS provided them, but according to Dolce, denied the meeting requests due to WTS' lack of availability.[16] On April 17, 2023, WTS submitted an EBITDA calculation for 2022 that was below the required threshold to entitle Sellers to an earn-out payment.[17] On May 4, 2023, Dolce objected to the calculation (the "Notice").[18] In the Notice, Dolce argued that WTS improperly allocated general charges of WTS to the Meet Hospitality Business Unit.[19] As support, WTS identified the absence of any corporate allocations in WTS' preliminary P&L statements.[20] It also identified two provisions in Section 5 of Exhibit F.[21] Bullet point one of Section 5 requires that

---

[14] *Id.* § 1.6(e)(i).

[15] AC ¶ 33.

[16] *Id.* ¶¶ 33, 34.

[17] *Id.* ¶¶ 28, 29.

[18] *Id.* ¶ 32.

[19] Aff. Driscoll, Ex. 4 ("Notice") at 1.

[20] *Id.* at 2.

[21] *Id.*

expenses include "expenses incurred by WTS that are directly attributable" to the Meet Hospitality Business.[22]  Bullet point four provides that:

> [e]xpenses related to any other employees or contractors shared between the Meet Hospitality Business Unit and [WTS] will be allocated between the Meet Hospitality Business Unit and [WTS] based on the relative proportion of work done for each entity as reasonably agreed between [WTS] and [Dolce] in good faith in writing (including via email). Such allocations shall be subject to periodic review and may be modified as reasonably agreed between [WTS] and [Dolce] in good faith in writing (including via email).[23]

WTS argued that under bullet point one, the general charges of WTS are not "directly attributable" to the Meet Hospitality Business Unit, and thus should have been excluded.[24]  Likewise, under bullet point four, any expenses for general corporate charges shared between the Meet Hospitality Business Unit should have been reasonably agreed by the parties in good faith, in writing and subject to periodic review – but allegedly were not.[25]  Dolce claimed that these "unilateral[]" cost allocations that were done "in hindsight" by WTS caused an "artificial EBITDA reduction" and prevented the "unit leader of the Meet Hospitality business" from managing the business differently to reduce costs.[26]

---

[22] APA, Ex. F § 5.

[23] *Id.*

[24] Notice at 2.

[25] *Id.*

[26] *Id.*; *see also* AC ¶ 36.

5

Dolce made two additional objections. It said that WTS failed to provide quarterly financial statements, an operating budget and forecasts.[27] It also identified purported inconsistencies in the allocation items in WTS' "Acquisition Income Statement."[28] To resolve these disputes, Dolce advised that the parties engage in discussions pursuant to Section 1.6(a)(ii)'s resolution process.[29]

Following discussions among the parties, on May 18, 2023, WTS submitted a revised EBITDA calculation, concluding (again) that Sellers were entitled to no earn-out payment.[30] Dolce contends that WTS made its revisions for the improper purpose of reducing the earn-out payments in breach of the APA.[31] On June 2, 2023, Dolce notified the designated Accountants that their services may be required.[32]

---

[27] Notice at 1-2.

[28] *Id*. at 2.

[29] *Id*. at 3.

[30] APA ¶ 39; Ex. 5 (Acquisition Income Statement from January 2022 to December 2022 – 05.15.2023 (Revised EBITDA Calculation)).

[31] APA § 1.6(f)(ii) states that "[WTS] agrees that, except as required by Law or GAAP, as otherwise permitted or contemplated by this Agreement or as consented to in writing by Seller, during the EBITDA Period, it will not take any of the following actions: …

> (ii) take any other action, the primary purpose of which is to reduce any of the Contingent Payments."

[32] Transmittal Affidavit of Christopher Viceconte in Support of Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss Plaintiff's Verified Amended Complaint (D.I. 21), Ex. A.

**C. This Litigation**

On June 22, 2023, WTS submitted its 2023 budget, which Dolce argues is based on improper allocations.[33]  On August 2, 2023, Dolce initiated this action by filing a Verified Complaint, which it amended on September 11, 2023.  The Amended Complaint raises breach of contract and implied covenant of good faith and fair dealing claims.  WTS moves to dismiss the complaint in favor of Section 1.6(a) of the APA.  The Court held oral argument on February 16, 2024 and took the motion under advisement.

## II.  STANDARD OF REVIEW[34]

A motion to dismiss based on an alternative dispute resolution provision goes to the court's subject matter jurisdiction and is properly reviewed under Court of Chancery Rule 12(b)(1).[35]  The burden is on the non-movant to establish that jurisdiction exists.[36]  "In deciding a 12(b)(1) motion to dismiss, the court may consider documents outside the complaint."[37]

---

[33] AC ¶ 42.

[34] The Court is resolving the motion under Court of Chancery Rule 12(b)(1), and therefore does not address Count II under the 12(b)(6) standard.

[35] *Rummel Klepper & Kahl, LLP v. Delaware River & Bay Auth.,* 2022 WL 29831, at *4 (Del. Ch. Jan. 3, 2022); *see also Gandhi-Kapoor v. Hone Cap. LLC*, 2023 WL 8480970, at *5 (Del. Ch. Nov. 22, 2023), *as corrected* (Dec. 4, 2023), *motion to certify appeal granted sub nom. Gandhi-kapoor v. Hone Cap. LLC & Csc Upshot Ventures I, L.P* (Del. Ch. 2023) ("By agreeing to litigate a dispute in a particular forum, parties can commit among themselves not to ask a court to exercise the subject matter jurisdiction it possesses.").

[36] *Wildfire Prods., L.P. v. Team Lemieux LLC*, 2022 WL 2342335, at *3 (Del. Ch. June 29, 2022).

[37] *Id*. (citation omitted).

### III.    DISCUSSION

Dolce's objections relate to issues the parties delegated to a third-party accounting firm for resolution.  Dolce's allegations, however, suggest that WTS has not provided it with the required information under the APA.  Dolce will have the opportunity to submit revised objections to the Accountants after WTS provides the required information.  The Court will revisit the claims in this action after the Accountants' determination.

As an initial matter, the APA limits the grounds upon which Dolce may object to the calculation of EBITDA.  Section 1.6(a) provides that any objections as to the EBITDA calculation must be limited on the basis of either (a) "arithmetic errors" or (b) that the calculation "was not prepared in accordance with [the APA] and the methodology and rules set forth in Exhibit F."[38]  If any component of the EBITDA calculation is "not subject to an objection," *i.e.*, not subject to the grounds listed above, that component of the calculation is final and binding.[39]  Only then may the parties "submit any remaining disputes, and only such remaining disputes, to the Accountants for review and resolution."[40]  The Accountants, therefore, have a

---

[38] APA §§ 1.6(a)(ii) and (b)(ii).

[39] *Id.*

[40] *Id.*

8

limited role. The grounds upon which WTS may dispute the calculation is also narrow.

On that limited basis, Dolce objected to (1) the allocation of general charges of WTS to the Business; (2) apparent inconsistencies in the Acquisition Income Statement and (3) missing information WTS was required to produce.[41] Under category (1), whether the general charges of WTS was proper or not falls under the provisions of Exhibit F, and thus, is a question for the Accountants.[42] Similarly, the line-item objections to the entries in the Acquisition Income Statement, which WTS responded to on May 18, 2023, is a question for resolution by the Accountants. Both categories of objections are the sort of fact-intensive and technical questions that fall within the ambit of the expertise of an accounting expert, and the parties agreed to delegate under Section 1.6(a).[43]

---

[41] *See* Notice.

[42] To the extent Dolce argues that the allocation of general charges can be resolved on no other provision but bullet point four of Section 5, the Accountants can and should be able to use their accounting discretion to recognize that allocation or not based on WTS' alleged failure to allocate the relative proportion of work for each entity. Other provisions of Exhibit F may also moot this question, and so weeding into the factual details of whether or not the general charges were due to work by a shared employee or contractor, and what, if any, efforts WTS took to agree to the proportion of work by the employee or contractor for each entity may be unnecessary depending on the Accountants' application of other provisions in Exhibit F. If this is ultimately beyond the scope of the Accountants' expertise, the parties' should include those arguments before the Accountants in their submissions.

[43] *See Stone v. Nationstar Mortg. LLC*, 2020 WL 4037337, at *8 (Del. Ch. July 6, 2020) (finding that disputes involving accounting methodology issues fall squarely within an accounting firm's expertise); *LDC Parent, LLC v. Essential Utilities, Inc.*, 2021 WL 1884847, at *5 (Del. Super. Apr. 28, 2021) (finding question of what is a "Capital Expenditure" in purchase agreement to be dispute for accountant to resolve); *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975,

In a letter to the Court, and at oral argument, Dolce raised *AQSR India Priv., Ltd. v. Bureau Veritas Holdings, Inc.* to the Court's attention.[44] In *AQSR,* the parties re-negotiated the acquisition of a company in India, and through an asset purchase agreement, they structured a process for the transfer and acquisition of certain customer contracts (the "Review Process").[45] The Review Process entailed a back-and-forth, in which the sellers and buyers reviewed the company's customer contracts for the buyers to purchase based on certain technical criteria; the buyers were required to submit notices on a weekly basis and a final closing statement that provided an accounting of the purchased contracts and final purchase price.[46] Any disputes as to the qualifying criteria for, or purchase price of, a contract went to a "referee," who was an expert from the relevant industrial board (the "Referee Procedure").[47]

The asset purchase agreement, however, never closed because of the buyers' non-cooperation with the Review Process.[48] The buyers did not cooperate in transferring the contracts, nor did they submit the weekly notices or final closing

---

997 (Del. Ch. 2023) (providing that accountant must resolve disputes regarding adjusted post-closing balance sheet's accounting methodology).

[44] 2009 WL 1707910, at *1 (Del. Ch. June 16, 2009).

[45] *Id*. at *5.

[46] *Id.*

[47] *Id*.

[48] *Id*. at *6.

statement.[49]  They also changed the criteria for the contracts halfway through the Review Process.[50]  Because the transaction did not close and due to the resulting uncertainty, the company lost nearly all its key employees and customers.[51]

The court denied buyers' motion for judgment on the pleadings to require the sellers to participate in the Referee Procedure.  It found that before the referee could resolve the technical issues under its expertise, the referree would "first need to wade through a mire of procedural and general factual issues," and that the referee was not "well-positioned" to do so.[52]  The court reserved the right to award a form of modified Referee Procedure as an ultimate remedy, but believed that before it could do so, a development of the factual record before the court was necessary to determine whether and how to "equitably salvage" the process.[53]

The instant case bears similarities to *AQSR*, but they are superficial and do not warrant the factual development Dolce seeks before submission of the accounting disputes can go to the Accountants.  To be clear, Dolce raises allegations that WTS did not fully cooperate in the process outlined in Exhibit F of the APA, nor provide the information Dolce should have received under the APA.  WTS has not provided

---

[49] *Id*. at *5.

[50] *Id*.

[51] *Id*. at *6.

[52] *Id*. at *7.

[53] *Id*. at *8.

11

a 2022 budget, unaudited quarterly financial statements, or timely profit and loss statements.

Nonetheless, failure to provide that information does not require a bypass of the parties' agreement to submit disputes as to the EBITDA calculation for expert resolution. The Court is not convinced that the failure to provide this information in real-time had an adverse effect that cannot now be cured by allowing Dolce to submit a revised objection based on the new information it receives, and for which the Accountants can resolve. Dolce's objections, as explained above, primarily relate to whether WTS improperly allocated general charges of WTS to the Meet Hospitality Business Unit, as well as line-item objections to the Acquisition Income Statement.

Dolce argues that the failure of WTS to engage in good faith in the process outlined in Exhibit F resulted in an "artificial EBITDA reduction."[54] But any information rights or access to personnel that the APA provided Sellers did not come in parallel with the right to manage the Business.[55] Based on Dolce's allegations, and in contrast to those in *AQSR*, the Court finds that, with production of the missing

---

[54] Notice at 2; AC ¶ 36.

[55] *See* APA § 2(f)(e)(i); *id.*, Ex. F §§ 1 and 3; APA § 2(e)(ii) (WTS agreed to provide Sellers "with reasonable access during normal business hours to the responsible personnel of the Meet Hospitality Business Unit for a discussion regarding the financial condition of the Meet Hospitality Business Unit and [WTS], *it being understood that Seller Equityholders will not interfere in any regard with the day to day operation of the Meet Hospitality Business Unit.*") (emphasis added).

information and opportunity to submit revised objections, the parties may be able to "tee[] up a narrow, technical question" under the purview of the Accountants.[56]

Allowing the contractually designated resolution process to proceed after Dolce has the opportunity to submit a revised objection with the information that was purportedly missing will thus help to resolve the accounting issues first. The accounting determination will better inform the determination of this Court as to whether Dolce states a valid claim for breach of Section 1.6(f)(ii) and breach of the implied covenant of good faith and fair dealing for WTS' alleged refusal to meet with Sellers and engage in good faith negotiations.

---

[56] *AQSR India Priv., Ltd.*, 2009 WL 1707910, at *2.

# IV. CONCLUSION

To the extent that WTS has failed to provide a 2022 budget, standalone profit and loss statements, and unaudited quarterly financial statements, WTS must either produce those documents or show that they are not necessary for Dolce to submit its objections to the Accountants. Dolce will then have the opportunity to submit revised objections to the Accountants for final and binding resolution of the EBITDA calculation.

Upon these conditions, this action is stayed in favor of the APA's alternative resolution process. Once the Accountants have made their determination, the Court will revisit the claims in this action.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge[57]

---

[57] Sitting as a Vice Chancellor of the Court of Chancery of the State of Delaware by designation of the Chief Justice of the Supreme Court of Delaware pursuant to *In re Designation of Actions Filed Pursuant to 8 Del. C. § 111* (Del. Feb. 23, 2023) (ORDER).